Filed in District Court
State of Minnesota
3/27/2026 10:13 AM

STATE OF MINNESOTA                                    FOURTH JUDICIAL DISTRICT

COUNTY OF HENNEPIN                                    Case Type:  CLASS ACTION

---

CORLIS MOON, individually and on behalf        Court File No. _____
of all others similarly situated,

     Plaintiff,                                           **SUMMONS**

v.                                                   **Jury Trial Demanded**

BEST BUY CO., INC.

     Defendant.

---

This Summons is directed to: **BEST BUY CO., INC.**

1.      **You are being sued**. The Plaintiff has started a lawsuit against you. The *Complaint* is attached to this *Summons*. Do not throw these papers away. They are official papers that start a lawsuit and affect your legal rights, even if nothing has been filed with the court and even if there is no court file number on this *Summons*.

2.      **You must both reply, in writing, and get a copy of your reply to the person/business who is suing you within 21 days to protect your rights.** Your reply is called an *Answer*.  Getting your reply to the Plaintiff is called <u>service</u>. You must serve a copy of your *Answer or Answer and Counterclaim* (Answer) within 21 days from the date you received the *Summons* and *Complaint*.

3.      **You must respond to each claim.**  The *Answer* is your written response to the Plaintiff's *Complaint*. In your *Answer* you must state whether you agree or disagree with each paragraph of the *Complaint*. If you think the Plaintiff should not be given everything they asked for in the *Complaint*, you must say that in your *Answer*.

4.      SERVICE: **You may lose your case if you do not send a written response to the Plaintiff.** If you do not serve a written *Answer* within 21 days, you may lose this case by default. You will not get to tell your side of the story. If you choose not to respond, the Plaintiff may be awarded everything they asked for in their *Complaint*. If you agree with the claims stated in the *Complaint*, you don't need to respond. A default judgment can than be entered against you for what the Plaintiff asked for in the *Complaint*. To protect your rights, you must serve a copy of your *Answer* on the person who signed this *Summons* in person or by mail at this address:

5.      **Alternative Dispute Resolution (ADR).** The parties may agree to or be ordered to participate in an ADR process under Rule 114 of the Minnesota Rules of Practice. You must still serve your written *Answer,* even if you expect to use ADR.

1

Dated:  March 27, 2026

**CUNEO GILBERT FLANNERY & LADUCA, LLP**

By:  s/  Robert K. Shelquist
Robert K. Shelquist (MN #21310X)
5775 Wayzata Blvd., Suite 620
St. Louis Park, MN 55416
Telephone: (612) 254-7288
rkshelquist@cuneolaw.com

**BURSOR & FISHER, P.A.**
Joseph I. Marchese
Ira Rosenberg
1330 Avenue of the Americas
32nd Floor
New York, New York 10019
Telephone: (646) 837-7150
Email: jmarchese@bursor.com
irosenberg@bursor.com

*Attorneys for Plaintiff*

2

Filed in District Court
State of Minnesota
3/27/2026 10:13 AM

STATE OF MINNESOTA

COUNTY OF HENNEPIN

FOURTH JUDICIAL DISTRICT

Case Type:  CLASS ACTION

---

CORLIS MOON, individually and on behalf of all others similarly situated,

       Plaintiff,

v.

BEST BUY CO., INC.

       Defendant.

Court File No. _____

**COMPLAINT**

**Jury Trial Demanded**

---

Corlis Moon ("Plaintiff") brings this action individually and on behalf of all others similarly situated (the "Class Members") against Defendant Best Buy Co., Inc. ("Defendant" or "Best Buy").  Plaintiff makes the following allegations pursuant to the investigation of his counsel based upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based upon his personal knowledge.

## NATURE OF THE ACTION

1.     This is a class action suit brought against Defendant Best Buy for selling Plaintiff's personally identifiable information ("PII") collected at Best Buy retail stores to third parties without notifying Plaintiff.  By selling PII for compensation, without providing proper notice to Plaintiff, Best Buy has violated Virginia's Personal Information Privacy Act, Va. Code Ann. §§59.1-442, *et seq.* (the "VPIPA").

2.     Best Buy is the largest specialty consumer electronics retailer in the United States, serving over 200 million customers a year.  Best Buy fails to adequately disclose to consumers its sale of their PII.

3.     In addition to traditional retail services, Best Buy maintains a retail media network ("RMN") called Best Buy Ads.  Brands who pay to join the RMN are able to advertise directly to

Filed in District Court
State of Minnesota
3/27/2026 10:13 AM

Best Buy shoppers across the Best Buy website, social media channels and in stores. These brands can also purchase valuable first-party customer data collected by Best Buy. To help advertisers reach Best Buy's customers more precisely and offer more valuable data, Best Buy Ads uses a data clean room ("DCR") to store and enhance the first party customer data collected by Best Buy.

4.      The customer data Best Buy sold and shared with the Live Ramp DCR includes customers' names (and other identifiers), email addresses, mailing addresses, phone numbers, and purchase histories.

5.      The DCR, operated by a data collaboration company called LiveRamp, claims to offer a more privacy-centric way for brands to centralize and share advertisers' consumer data. Advertisers, like Best Buy Ads input the personal data of customers into the so called "clean" room where the information is then supposedly pseudonymized and added to a unique customer ID for each customer and then combined with data already maintained by LiveRamp. The clean room then organizes this data to create enhanced profiles of customers that its partners, such as Best Buy Ads, can use to target advertisements more precisely to customers and provide highly specific customer data to brands that choose to partner with Best Buy Ads.

6.      Despite the supposed privacy protections advertised by DCRs, the FTC has warned that data clean rooms do not automatically prevent the impermissible disclosure of consumer data and can still lead to privacy law violations.[1]

7.      Best Buy collects and sells PII with the LiveRamp clean room to create enhanced profiles for its retail media network customers. The customer information inputted into the clean room is not anonymized and is sold without Best Buy retail customers' consent. Best Buy then sells enhanced customer information to brands through Best Buy Ads.

---

[1] https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/11/data-clean-rooms-separating-fact-fiction.

2

8. Furthermore, Best Buy violates VPIPA by not providing adequate notice to consumers that their nonpublic personal information is being sold to a third party.

9. Best Buy sells their customers' personal information with data clean rooms to supplement its revenues. By offering enhanced customer profiles, Best Buy Ads is better able to target advertisements to their customers. This ability to target consumers helps Best Buy earn more revenue because more brands are willing to purchase advertising information through Best Buy Ads to gain access to the customer data.

10. Best Buy profits handsomely from the unauthorized sale and disclosure of customers' purchasing patterns and other personal information and does so at the expense of its customers' statutory privacy rights.

11. The VPIPA clearly prohibits what Defendant does. The VPIPA provides:

> No merchant, without giving notice to the purchaser, shall sell to any third person information which concerns the purchaser and which is gathered in connection with the sale, rental or exchange of tangible personal property to the purchaser at the merchant's place of business.

Va. Code Ann. § 59.1-442(A).

12. Accordingly, Plaintiff brings this Class Action Complaint against Defendant for its intentional and unlawful sale of its customers' PII in violation of the VPIPA, and for unjust enrichment.

## THE PARTIES

### *Plaintiff*

13. Plaintiff Corlis Moon is, and was at all relevant times, an individual and citizen of Virginia. Plaintiff Moon currently resides in Manassas, Virginia.

14. In the relevant statutory period, Plaintiff Moon purchased products from a retail Best Buy store location in Manassas, Virginia. Defendant sold Plaintiff's PII, including but not

3

limited to, the purchasing patterns of Plaintiff, and disclosed Plaintiff's information to a third party without providing adequate notice.

***Defendant***

15.    Defendant Best Buy Co., LLC, is incorporated in Delaware and headquartered in Richfield, Minnesota.  Best Buy operates at least 32 retail stores across Virginia.  Best Buy is a traditional retailer who also manages Best Buy Ads, a retail media network.

## JURISDICTION AND VENUE

16.    This Court has personal jurisdiction over Defendant because Defendant is headquartered in and has its principal place of business in the County of Hennepin, State of Minnesota.

17.    Venue is proper in this Court  because Defendant Best Buy Co, Inc. resides in this County, conducts business in this County, and conducts business nationally emanating from this County.

## FACTUAL ALLEGATIONS

**A.    The Rising Value of First Party Data, Retail Media Networks, and Data Clean Rooms.**

**i.    *The Value of First Party Data***

18.    In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[2]

---

[2] The Information Marketplace:  Merging and Exchanging Consumer Data  (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

4

19.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[3]

20.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[4]

21.     Today, customer data is "the lifeblood" of modern businesses with companies spending significant portions of their marketing budgets on collecting this vital information.[5]

22.     There also is no debate that there is a market for individuals data and information. Companies pay billions of dollars to access it, and companies frequently offer incentives for customers to share personal information.  For example, Google is now paying people to share their personal data in "Data Usage" studies.[6]

23.     Customer's personal information also has a monetary value.  A study conducted by a marketing agency found that an individual's online identity can be sold for $1,200 on the dark web and Facebook logins can be sold for $5.20 each. [7]  Furthermore, Facebook has also paid underage users for their content and information.[8]

---

[3]*See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html.
[4]Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.
[5]https://www.forbes.com/councils/forbestechcouncil/2023/10/24/the-evolution-of-retail-media-networks-the-first-party-data-revolution/.
[6]https://deviceusagestudy.google
[7]https://www.marketwatch.com/story/spooked-by-the-facebook-privacy-violations-this-is-how-much-your-personal-data-is-worth-on-the-dark-web-2018-03-20
[8] https://techcrunch.com/2019/01/29/facebook-project-atlas/.

5

24.    LiveRamp also recognizes the monetary value of user data and exists because of the high value of customer information.

25.    LiveRamp is a registered "data broker" in California.[9]  California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions.  (Cal. Civ. Code § 1798.99.80(c).)

26.    This is notable because data brokers profit by monetizing user data.

27.    "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[10]

28.    Collecting information on users' spending habits, the retail stores they visit, and their preferences helps to support a massive digital advertising market that generates $225 billion in revenue.

29.    Data Brokers can track users across the Internet and physical activity, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. [11]

30.    In sum, there is positive economic value to users' data.  And retailers, including Best Buy, exploit this by operating retail media networks.

_____

[9] https://oag.ca.gov/data-brokers?combine=liveramp.

[10] Justin Sherman, *Data Brokers and Sensitive Data on U.S. Individuals: Threats to American Civil Rights, National Security, and Democracy*, 2 (Duke Sanford Cyber Policy Program, 2021), https://tinyurl.com/hy9fewhs.

[11] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, Fathom Analytics (May 10, 2022), https://usefathom.com/blog/data-brokers.

6

*ii.    How Retail Media Networks Collect and Share Data*

31.    Companies collect data in two ways.  They collect "first party" data on their own consumers by tracking how consumers interact directly with a company's channels, such as their retail purchases or website visits.  Advertisers can also collect or purchase "third party" data collected by another source.

32.    Since the early 2000s, companies have acquired customer data mainly using third-party cookies because cookies offered an easy way to gain valuable information about customers' preferences.  However, in recent years these third-party cookies have faced numerous privacy concerns and legal threats.  Such concerns have forced browsers such as Apple Safari, Mozilla Firefox, and Brave Browser to block third party cookies.[12]

33.    The phaseout of cookies has not decreased the value of customer data nor has it stopped companies from collecting customer data.  Instead, advertisers have leaned more heavily on first party data and have created new ways to share first party data with each other.[13]

34.    One way in which companies now leverage first party data is through retail media networks.  RMN's are advertising platforms set up by retailers that sell ad space to third party brands looking to advertise directly to retailers' consumers.[14]

35.    Retailers, including Best Buy, first collect data from their own customers such as what a customer purchases or how often they shop with the retailer.  Retailers, including Best Buy, then sell this first party data to advertisers directly or offer advertisement space using the data. These brands can create ad campaigns or run analyses for their products using the first party data

---

[12]https://www.cookiebot.com/en/google-third-party-cookies/#
:~:text=Mozilla's%20Firefox%2C%20Brave%20Software's%20Brave,third%2Dparty%20advertising%20
data%20entirely.
[13]https://www.forbes.com/councils/forbestechcouncil/2023/10/24/the-evolution-of-retail-media-networks-the-first-party-data-revolution/.
[14] https://www.retaildogma.com/retail-media-networks/.

7

provided by the RMN.  Advertisements are then targeted to consumers at the point of purchase through a retailer's app, website, or in store.  The retailer can use the purchasing patterns of customers who view the ads to further enhance their existing first party data.

36.     The data and ad space offered by RMNs is extremely valuable to brands and has led to a significant increase in RMN ad spending.  In fact, "nearly 60% of companies now run external data-sharing partnerships" and "[93%] of US executives believe combining and analyzing data sets is critical to driving increased revenue."[15]  The retail media network market is valuable too, 2024 ad revenue reached $258.6 billion in revenue.[16]  In sum, retail media networks offer retailers an effective way to monetize their collected first party data and leverage their direct access to customers.

37.     For large retail media networks, it is not enough to just provide prospective brands with retailers' own first party data.  Instead, retailers are now seeking to integrate their own first party data with first party data collected by other entities to create an even more precise profile of their customers.  Retailers utilize data clean rooms to share first party data on customers and build enhanced customer profiles using the data.  These customer profiles make RMNs even more valuable to third party brands seeking to advertise to consumers through a retailer's network.

38.     The industry definition of a DCR, per the IAB Tech Lab's guidance is "a secure collaboration environment in which two or more parties can use data for very specific, mutually

---

[15] https://liveramp.com/data-clean-room-playbook-interactive/.
[16] https://www.iab.com/wp-content/uploads/2025/04/IAB_PwC-Internet-Ad-Revenue-Report-Full-Year-2024.pdf.

8

Filed in District Court
State of Minnesota
3/27/2026 10:13 AM

agreed-upon purposes while simultaneously limiting any exposure of the data."[17] Such "rooms" are used when two or more companies want to exchange information about their customers.[18]

39.     DCR's can for example "combine first-party data with retailers' email datasets or purchase histories and compare match rates across channels[.]"  These collaborations help to discover "relevant audiences" and "tailor ad content… to specific interests and lifestyles."[19]

40.     In a LiveRamp clean room, a retailer inputs its first-party data into the clean room. Then, the first party data is enhanced with LiveRamp's existing data to build profiles on each customer.  Each customer is given a unique identification number within the clean room and those with access to the clean room can then target ads to those customers.[20]

41.     LiveRamp is able to match it's existing customer data to first-party inputted by retailers through a process they call "Identity Resolution."  LiveRamp describes it as "the process of connecting the dots between consumers' digital footprints to give the full picture of their online behavior across devices, channels, and touchpoints." [21]

42.     A RMN then can use this information on its customers enhanced by identity resolution to offer precise information to brands on where and how it should advertise to specific customers.

43.     Thus, using the augmented first party data and highly specific customer profiles offered by a DCR is extremely valuable to a retail media network trying to sell advertisement space across their platforms.

---

[17]https://iabtechlab.com/blog/wp-content/uploads/2023/06/Data-Clean-Room-Guidance_Version_1.054.pdf.

[18]https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/11/data-clean-rooms-separating-fact-fiction.

[19] https://liveramp.com/data-clean-room-playbook-interactive/.

[20] https://liveramp.com/data-clean-rooms/

[21] https://liveramp.com/blog/what-is-identity-resolution/.

**B.     The Privacy Risks of Data Clean Rooms and How Consumers Value Privacy**

44.     Despite the lofty promises and the significant economic benefits for retailers, consumers' basic privacy rights have not been adequately protected by the use of data clean rooms.

45.     Recently the FTC pointed out the potential privacy dangers of DCRs in an article "Data Clean Rooms: Separating Fact from Fiction."[22]

46.     The article points out that despite their "squeaky-clean name" DCRs "are not rooms, do not clean data, and have complicated implications for user privacy[.]"

47.     According to the FTC, while DCRs can add some privacy protections, they still may present "the same privacy risks as disclosure through other means like tracking pixels[]"and "can also be used to obfuscate privacy harms."[23]

48.     DCR's can be used in ways to make it easier to identify and track people, both across the web and in the real world.  Further, DCRs add more access points to data and increase the risk of data leaks and breaches.[24]  Therefore, they are not the privacy silver bullets that retailers such as Best Buy believe them to be.

49.     These privacy risks matter to consumers.  As technology has seeped its way into every aspect of life, consumers are becoming more aware of their digital privacy and now demand better privacy safeguards.

50.     In a recent study, 95% of consumers said they wouldn't buy from a company if they believed that their data was not protected.[25]

---

[22]https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/11/data-clean-rooms-separating-fact-fiction.
[23] *Id.*
[24] *Id.*
[25]https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-privacy-benchmark-study-2025.pdf.

10

51.    Customers also place an economic value on privacy.  One study found that consumers would be willing to pay $5 a month to maintain data privacy and would demand $80 to allow access to personal data.

52.    Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

53.    Companies recognize the value that consumers place on privacy and try to appeal to these privacy-centric consumers by pitching their advertising techniques as privacy safe. However, many of these efforts do not actually protect consumers data and big tech has been accused of "privacy washing" to appease consumers concerned about data privacy.[26]

54.    Data clean rooms are part of advertiser's "privacy washing" strategies.  Data clean rooms advertise themselves as a service to protect consumer data.  Live Ramp itself claims, "[f]irst-party data goes in, and aggregated insights come out, without copying any data and concealing all personally identifiable information (PII)."[27]   Forbes puts it another way: "[i]magine accessing another brands' customer data without any privacy breaches."[28]

55.    Despite these lofty ambitions of protecting customers personal data, DCR's are not the consumer privacy silver bullet that they claim to be.

56.    Best Buy is still selling consumer's PII in order to boost the revenue of its retail media network.  The use of a data clean room does not alleviate this privacy violation.

---

[26]    https://calawyers.org/business-law/privacy-washing-what-is-it-and-how-to-stop-it-from-happening-to-your-company/.
[27] https://liveramp.com/data-clean-room-playbook-interactive/.
[28]https://www.forbes.com/councils/forbestechcouncil/2023/10/24/the-evolution-of-retail-media-networks-the-first-party-data-revolution/.

57.    Best Buy and LiveRamp are able to offer precise customer profiles to third-party brands that want to advertise through Best Buy Ads.  Best Buy customers are more valuable to these brands because their purchasing history is linked to their customer profiles.  Thus, Defendant is unjustly enriched through advertising revenue by sharing the personal information of Plaintiff and Class Members' with a Data Clean Room without consent.

58.    Best Buy claims to offer privacy protections for its consumers but in reality is sharing data without consent and without compensation to its customers.

59.    As such, where a business offers their customers privacy protections that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

## C.    Best Buy's Data Collection and Data Clean Room Practices

60.    Best Buy collects first party customer data and maintains a database of customer PII, including names (and other identifiers), email addresses, and purchase histories.[29]

61.    Best Buy Ads, like so many other retail media networks, does not simply offer its own first party data to brands seeking to advertise through the network.  Instead, it offers comprehensive customer profiles enhanced with first- and third-party data provided in a data clean room.

62.    Best Buy launched their retail media network, Best Buy Ads, in February 2022, offering businesses the opportunity to "reach high-intent tech enthusiasts when they're actively searching for products."[30]

---

[29] *See* https://www.bestbuyads.com/wegotnext (Video at 18:20)
[30] https://www.schermer.co/work/best-buy-ads/.

12

63.     Best Buy Ads offers to connect "ad exposure directly to purchase behavior" by enriching customer's transactional data with "psychographic and behavioral signals." [31]

64.     Best Buy has over 200 million customers, or 80% of the U.S. adult population, with more than 2 billion customer interactions per year.  Best Buy Ads claims to have fifteen thousand unique attributes that it can use to enrich this data.[32]

65.     Furthermore, Best Buy Ads boasts that it can tie 93% of transactional revenue to a customer.[33]

66.     In sum, Best Buy has access to a massive amount of purchase history data, and through its retail media network offers and sells not only this data but also valuable, precise insights into this data for which brands are willing to pay a premium.  According to BCG, ad spending on RMNs is projected to grow by 25% per year to $100 billion over the next five years and will account for over 25% of total digital media spending by 2026.[34]

67.     Best Buy highlights how it tracks a customer journey through its retail media network.  First, it tracks a customer who engages with targeted social media for a laptop.  Then, it tracks that consumer make the purchase and subsequent accessory purchases and repairs.  Best Buy Ads claims that "our ability to observe these long-term customer journeys are the foundation of our data set that we also enrich with third party data to build audience segments across intender, consideration, and transactional cohorts."[35]

68.     It offers a "360 degree portfolio" including advertising options on the best buy website and in stores.[36]

---

[31] https://www.bestbuyads.com/wegotnext.
[32] https://www.bestbuyads.com/Home.
[33] *Id.*
[34] https://www.bcg.com/publications/2022/how-media-is-shaping-retail.
[35] https://www.bestbuyads.com/wegotnext.
[36] https://www.beet.tv/2023/01/best-buy-runs-faster-to-the-clean-room-mark-heitke.html.

13

69.    From the moment a customer interacts with Best Buy on any platform, a comprehensive profile is being built on them.  This precise targeting is extremely valuable to brands seeking to advertise through the Best Buy Ads platforms.

70.    Such precise targeting of 200 million consumers is done through the capabilities of Data Clean Rooms.

71.    Best Buy Ads offers their own first party data to brands seeking to advertise through their network and is partnered with LiveRamp for its data clean rooms.

72.    LiveRamp collects data from sources such as credit card transactions and location data and connects it with data collected by advertisers to build customer's online profiles.  The company claims that it has data profiles for 250 million Americans.[37]

73.    LiveRamp also uses "Identity resolution" to connect data across its platforms to create a "unified view" of consumers.

74.    In 2022, Best Buy Ads partnered with Habu, a data clean room software provider, as a way to "improve audience analysis and bring brands to retail." [38]

75.    In 2024, Habu was acquired by LiveRamp and promised that "[f]or the first time, companies will have one, simple platform to measure campaigns across all programmatic and media channels…"  The move also now allowed companies unprecedented access to customer data.

76.    By partnering with LiveRamp, Best Buy could enhance their already vast customer database with the extensive profiles built by LiveRamp.

---

[37] https://themarkup.org/privacy/2021/04/01/the-little-known-data-broker-industry-is-spending-big-bucks-lobbying-congress#:~:text=The%20company%20claims%20to%20have,a%20%E2%80%9Cdata%20connectivity%20platform.%E2%80%9D.

[38]https://www.beet.tv/2024/02/liveramp-acquired-habu-to-make-data-integration-user-friendly-ceo-howe.html.

14

77.    Such information is invaluable to companies.  A LiveRamp study found that 93% of business rely on data collaboration to drive revenue.  Furthermore, 59% of those businesses collaborate with external partners who have more first-party data than they do.

78.    For brands who choose to pay for Best Buy Ads, they can also input their own first party data to overlap it with Best Buy's first party data.  Therefore, Best Buy Ads sells consumer data in two ways: through enhanced customer profiles and through the opportunity to overlap data in Best Buy's data clean room.

79.    Best Buy profits by selling this enhanced customer data to brands and allowing them to create more precise advertising campaigns through the various platforms within Best Buy Ads.

**D.    Best Buy Unlawfully Sells Purchasers' Personal Information for Compensation without Adequate Customer Notice and Consent.**

80.    Every time a customer makes a purchase at a Best Buy retail store in Virginia, Best Buy collects PII about that customer.

81.    Using that information, Best Buy maintains a vast digital database of its customers' nonpublic purchase history and PII.

82.    Best Buy discloses for compensation this nonpublic personal information to the LiveRamp data clean room.

83.    LiveRamp combines the first party data from Best Buy and LiveRamp's own sensitive private information about Best Buy customers to create enhanced customer profiles for Best Buy Ads.

84.    The enhanced customer information that Best Buy receives back from the data clean room, in exchange for allowing the clean room to use Best Buy's customer list for their own

15

business purposes, is more valuable to Best Buy than the original first party data they collected and provided to LiveRamp.

85.    Best Buy, through Best Buy Ads, sells the enhanced data to provide more precise information about customers to brands seeking to advertise across Best Buy platforms.  Best Buy charges more for the use of best Buy Ads because of the enhanced data it has received through the clean room.

86.    Best Buy sells sensitive customer interactions to third parties without giving prior notice as required by Va. Code §§ 59.1-442.

87.    Nowhere throughout the buying process, not even in the Best Buy Privacy Policy, will a customer be provided with the proper notice required by the VPIPA.[39]

88.    By and through these actions, Best Buy has intentionally sold to third parties their Virginia customers' PII, in direct violation of the VPIPA with respect to Plaintiff and other members of the class.

## CLASS ACTION ALLEGATIONS

89.    **Class Definition:** Pursuant to Minnesota Rule of Civil Procedure 23, Plaintiff seeks to represent a nationwide class (the "Nationwide Class") defined as all people in the United States whose PII was shared by Best Buy to a third party data clean room then sold to other third parties through Best Buy Ads during the class period (the "Class").

90.    Plaintiff seeks to represent a subclass consisting of Class Members in Virginia (the "Virginia Subclass" or "Subclass").

---

[39] https://www.bestbuy.com/site/help-topics/privacy-policy/pcmcat204400050062.c?id=pcmcat204400050062#widget-c607f17c-7838-45d8-a276-28745230cebd.

16

Filed in District Court
State of Minnesota
3/27/2026 10:13 AM

91.    Plaintiff reserves the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

92.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

93.    Excluded from the Class and Subclass are the Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his/her spouse and immediate family members; and members of the judge's staff.

94.    **Numerosity:** Members of the Class are so numerous that joinder of all members is impracticable.  The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are at least thousands of individuals in the Class.  The identity of such membership is readily ascertainable from Defendant's records.

95.    **Typicality:** Plaintiff's claims are typical of the Class because, among other things, all such claims arise out of the same unlawful course of conduct in which Best Buy engaged. Plaintiff and those similarly situated shopped with Best Buy and had their shopping preferences sold without proper notice.

96.    **Adequacy:** Plaintiff will fairly and adequately protect the interests of all class members because it is in his best interest to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiff also has no interests that are in conflict with, or antagonistic to, the interests of class members. Plaintiff has retained highly competent and experienced class action attorneys to represent his interests and

17

Filed in District Court
State of Minnesota
3/27/2026 10:13 AM

those of the classes. By prevailing on his own claims, Plaintiff will establish Best Buy's liability to all Class Members. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation, generally, and in the emerging field of digital privacy litigation, specifically. Plaintiff and his counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

97.    **Commonality:** This action involves common questions of law and fact to the potential Classes because each class member's claim derives from the same unlawful practices of Best Buy. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Classes to recover. The questions of law and fact common to the Class include, but are not limited to, whether Best Buy violated the Virginia Personal Information Privacy Act; whether Best Buy provided adequate notice required by VPIPA; whether Best Buy collected "nonpublic personal information" and disclosed such information to a third party for compensation; whether Defendant obtained consent before selling to third parties Plaintiff's and the Class's PII; whether the class members are entitled to actual and/or statutory damages for those violations; and whether Defendant was unjustly enriched.

98.    **Superiority:** Class action treatment is the superior method for the fair and efficient adjudication of this controversy. Such treatment permits a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including

18

providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in the management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Virginia Personal Information Privacy Act
### (Va. Code §§ 59.1-442, *et seq.*)

99. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

100. Plaintiff brings this claim individually and on behalf of members of the Virginia Subclass against Defendant.

101. Defendant is a "merchant" because it is "engaged in the sale of goods from a fixed retail location in Virginia." *See* Va. Code § 59.1-442(B).

102. Plaintiff made purchases at Best Buy retail stores in Virginia.

103. At all times relevant and beginning on the dates Plaintiff made his purchases at Best Buy retail stores in Virginia, Defendant sold Plaintiff's PII (including his name, email address, mailing address, phone numbers, and other identifiers), which identified his as Best Buy customer and his purchase history.

104. First, Defendant sold and shared this PII with LiveRamp through its data clean rooms. The LiveRamp clean room enhanced the PII collected by Best Buy. Defendant then sold the enhanced customer data to third-party brands seeking to advertise to Best Buy's vast customer base.

19

105.    Because the enhanced customer data included additional information from the data clean rooms, the PII was more valuable, and Defendant was able to increase the profits gained from the PII collected in its Virginia Retail stores.

106.    By selling data enhanced from clean rooms to third party brands to increase profits, Defendant sold to third persons information which concerns the purchaser, and which was gathered in connection with the sale, rental or exchange of tangible personal property to the purchaser the merchant's place of business. *See* Va. Code § 59.1-442(A).

107.    The information Defendant sold includes Plaintiff's names (and other identifiers), email addresses, mailing addresses, phone numbers, and their purchasing history at Best Buy stores. Accordingly, the records or information sold by Defendant includes Plaintiff's identity. *See* Va. Code § 59.1-442(A).

108.    Plaintiff and the members of the Class never consented to Defendant selling their PII to anyone.

109.    Worse yet, Plaintiff and the members of the Class did not receive notice before Defendant sold their PII to third parties.

110.    When Plaintiff made purchases at Best Buy stores there were no signs posted warning of the data sharing policies and Best Buy did not follow any other reasonable method for providing such notice. *See* Va. Code § 59.1-442(A).

111.    The information sold by Defendant was not gathered for purposes of extending credit and was not gathered for the purposes of the recording and sale, rental, exchange or disclosure to others of information obtained from any public body as defined in the Virginia Freedom of Information Act, Va. Code §§ 2-2-3700, *et seq.*

20

112.    Defendant's sales of Plaintiff's and the Class's PII were not made pursuant incidental to the sale or other disposition of accounts receivable.

113.    Defendant's sales of Plaintiff's and the Class's PII were not made in conjunction with check validation transactions.

114.    Defendant's sales of Plaintiff's and the Class's PII were not made in connection with any sale by Defendant of their retail operations at one or more locations.

115.    Defendant's sales of Plaintiff's PII were made to data clean rooms and advertising platforms in order to increase Defendant's revenue.

116.    By selling Plaintiff's PII, Defendant violated Plaintiff's and the Class's statutorily-protected right to privacy under the VPIPA. *See* Va. Code §§ 59.1-442, *et seq.*

117.    Additionally, because Plaintiff and the members of the Class paid for their Best Buy purchases, and Defendant was obligated to comply with the VPIPA, Defendant's unlawful sale of Plaintiff's and the other Class members' PII deprived Plaintiff and the Class members of the full value of their paid-for Best Buy purchases. Because Plaintiff and the other Class members ascribe monetary value to the privacy of their PII, Defendant's unlawful sale of their PII caused them to receive less value than they paid for, thereby causing them economic harm.

118.    Likewise, because Plaintiff and the other Class members ascribe monetary value to the privacy of their PII, a Best Buy purchase that keeps their PII private is more valuable than one that does not.

119.    Accordingly, had Plaintiff been adequately informed of Defendant's data sales practices, they would not have been willing to make their Best Buy purchases at the price charged, if at all. Thus, Defendant's unlawful sales caused Plaintiff economic harm.

21

120.    As a result of Defendant's unlawful and continued disclosure of their PII, Plaintiff and the members of the Class have suffered privacy and economic injuries.  On behalf of themselves and the Class, Plaintiff seeks:  (1) an injunction requiring Defendant to provide notice and/or obtain consent from Virginia customers prior to the disclosure of their PII as required by the VPIPA; (2) damages in the amount of $100 per violation, per Class member pursuant to Va. Code § 59.1-444; and (3) costs and reasonable attorneys' fees pursuant to Va. Code § 59.1-444.

## COUNT II
### Unjust Enrichment

121.    Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

122.    Plaintiff brings this claim individually and on behalf of the Members of the Nationwide Class.

123.    Plaintiff so brings this claim on behalf of the Members of the Virginia Subclass.

124.    Plaintiff, Class members, and Subclass Members conferred a benefit on Defendant by having their data shared with Data Clean Rooms and compiled into enhanced customer profiles. Defendant profited off of these profiles by selling more valuable ad space and the data itself to third parties seeking to advertise through Best Buy Ads.  Therefore, Defendant unlawfully enriched itself by collecting and enhancing this data with proper consent from Plaintiff, Class members, and Subclass members.

125.    First party customer data is valuable to advertisers thus by creating enhanced customer profiles, Best Buy Ads could offer their customers more precise advertising.  Advertisers are willing to spend more money advertising through Best Buy Ads because of these enhanced customer profiles and precise advertising.  Best Buy did all this without proper customer consent

22

or compensating customers.  Therefore, Plaintiff, Class members and Subclass Members conferred a financial benefit on Defendant but did not receive their expected benefit therefrom.

126.    It is unjust and inequitable for the Defendant to retain these benefits because they collected and profited off of Plaintiff, Class members, and Subclass members' personal information without providing statutorily required notice.

127.    Equity cannot in good conscience permit Defendant to retain the benefits derived from Plaintiff, Class members, and Subclass members through its unjust and unlawful acts, and therefore restitution or disgorgement of the amount if their unjust enrichment is required.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the members of the Class and prays for relief and judgment, as follows:

(a)    For a determination that this action is a proper class action;

(b)    For an order certifying the Class, naming Plaintiff as the Class representative, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(c)    For an order declaring that Defendant's conduct violated the statutes referenced herein;

(d)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(e)    For an award of compensatory damages, including statutory damages where available, to Plaintiff and the Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

23

(f)    For an order requiring Defendant to disgorge revenues and profits wrongfully obtained or by which it has been unjustly enriched;

(g)    For prejudgment interest on all amounts awarded;

(h)    For injunctive relief as pleaded or as the Court may deem proper;

(i)    For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit; and

(j)    For an order granting Plaintiff and Class Members such further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and on behalf of the members of the proposed Class, demands a trial by jury for all claims asserted in this Complaint so triable.

Dated: March 27, 2026                  **CUNEO GILBERT FLANNERY & LADUCA, LLP**

By: s/ Robert K. Shelquist
Robert K. Shelquist (MN #21310X)
5775 Wayzata Blvd., Suite 620
St. Louis Park, MN 55416
Telephone: (612) 254-7288
rkshelquist@cuneolaw.com

**BURSOR & FISHER, P.A.**
Joseph I. Marchese
Ira Rosenberg
1330 Avenue of the Americas
32nd Floor
New York, New York 10019
Telephone: (646) 837-7150
Email: jmarchese@bursor.com
irosenberg@bursor.com

*Attorneys for Plaintiff*

24

Filed in District Court
State of Minnesota
3/27/2026 10:13 AM

## ACKNOWLEDGEMENT

Pursuant to Minn. Stat. §549.211 (1) and (3), the party or parties represented by the undersigned attorneys acknowledge(s) that costs, disbursements, and reasonable attorney and witness fees may be awarded to the opposing party or parties for actions in bad faith; the assertion of a claim or a defense that is frivolous and that is costly to the other party; the assertion of an unfounded position solely to delay the ordinary course of the proceedings or to harass; or the commission of a fraud upon the Court.

Dated:  March 27, 2026       **CUNEO GILBERT FLANNERY & LaDUCA, LLP**


By:  /s/  Robert K. Shelquist
Robert K. Shelquist, #21310X

25